# United States Court of Appeals

## For the Eighth Circuit

_____

No. 19-1955

_____

Brett August Kohorst

*Plaintiff - Appellant*

v.

Thomas J. Smith, in their individual capacity as Burnsville Police Officer; Steven Stoler, in their individual capacity as Burnsville Police Officer

*Defendants - Appellees*

_____

Appeal from United States District Court
for the District of Minnesota

_____

Submitted: June 18, 2020
Filed: August 6, 2020

_____

Before KELLY, ERICKSON, and STRAS, Circuit Judges.

_____

ERICKSON, Circuit Judge.

Brett Kohorst sued officers Thomas J. Smith and Steven Stoler of the Burnsville Police Department alleging claims of excessive force under 42 U.S.C. §

1983. The district court[1] granted the officers' motion for summary judgment based on their claim of qualified immunity. We affirm.

## I. Background

During the nighttime hours of November 19, 2015, Officer Smith was dispatched to the area of a 911 report that the caller had given two highly intoxicated men a ride to a neighborhood near Lake Crystal, Minnesota, and that after they had been dropped off the caller had observed them knocking on random doors.[2] The caller expressed concern that the two were at risk of freezing or walking into the nearby lake. A contemporaneous Computer Aided Dispatch ("CAD") report indicated the individuals were suspected of participating in an altercation at a movie theater earlier in the evening. Officer Smith had his laptop open during his patrol. Upon arrival, Officer Smith found a visibly intoxicated Kohorst wandering the streets with his pants undone.

Officer Smith approached Kohorst and attempted to strike up a conversation with Kohorst directing him to take a seat on the hood of the squad car. Officer Smith observed that Kohorst was extremely intoxicated. While Kohorst's responses to the officer's questions and instructions to sit on the squad car were semi-coherent, Kohorst plainly did not sit on the squad car or respond to Officer Smith's initial inquiries but rather stated, "I'm looking for my friend Jacob." Officer Smith repeated his request that Kohorst sit on the car three more times and told him to get his hands out of his pockets. It is debatable whether or not Kohorst was sober enough to understand the nature of Officer Smith's directions. That said, although Kohorst did

---

[1]The Honorable Joan N. Ericksen, United States District Judge for the District of Minnesota.

[2]A neighborhood resident had also called 911 to report a male screaming at the top of his lungs.

not sit down, he did remove his hands from his pockets in order to fix his pants after Officer Smith informed him that his pants were undone. Officer Smith then asked Kohorst where his friend was. Kohorst responded by asking if there was a reason why Officer Smith was looking for his friend. Officer Smith told him, "Yeah, [because] someone called us [because] they think you guys are lost and drunk. The guy who dropped you off here." After adjusting his pants, Kohorst returned his hands to his pockets. Officer Smith twice more asked Kohorst to keep his hands out of his pockets. Eventually Kohorst complied.

Despite repeated requests from Officer Smith, Kohorst failed to provide any information about his residence beyond saying that he lived in Apple Valley, Minnesota. Eventually the officer asked Kohorst for his identification. Kohorst responded by taking his wallet out of his back pocket, holding it against the front of his chest, and placing his other hand back in his pocket. When Officer Smith reached for the wallet, Kohorst jerked it away and held the wallet behind his back. Officer Smith grabbed Kohorst's arm and attempted to place him in an escort hold. The body-cam video at this point became obscured because of Officer Smith's close proximity to Kohorst. However, the two appeared to struggle. Officer Smith, who was still alone on the scene, called for assistance. He repeatedly told Kohorst, "Do not fight with me" and instructed Kohorst numerous times to place his hands behind his back. Kohorst refused to comply. Officer Smith then initiated an arm-bar takedown and took Kohorst to the ground.

Once Kohorst was on the ground, Officer Smith repeatedly directed him to place his hands behind his back and unsuccessfully tried to handcuff Kohorst. Finally Officer Smith warned Kohorst that if he did not comply he would be tased. Kohorst responded by placing his left arm behind his back while keeping his right arm underneath him or at his side while appearing to roll to his side. Officer Smith tased Kohorst in "drive stun mode" and once again attempted to place Kohorst's arms in a position to handcuff him. Kohorst continued to attempt to roll onto his back or

press himself up off the ground. Officer Smith continued to order Kohorst to his stomach with his hands behind his back but Kohorst continued to fail to comply. At this point, Officer Smith pushed Kohorst's shoulder toward the ground causing Kohorst's face hit the pavement, splitting his chin. Officer Smith again ordered Kohorst to put both hands behind his back. Kohorst responded "they are," even though only his left arm was behind his back. Officer Smith repeated his commands twice more. Kohorst did not comply. Officer Smith then tased Kohorst in "barb" mode causing Kohorst to roll onto his back.

During the second tasing, Officer Smith continued to order Kohorst to put his hands behind his back "or I'm going to tase you again." In response to Officer Smith's instructions, Kohorst stated that he was trying to get his wallet. By now Kohorst had rolled to his stomach with his left arm behind his back and his right arm at his side. Officer Smith tried to pull Kohorst's right arm behind Kohorst's back, but Kohorst pulled it away and moved both arms toward the ground. Officer Smith once again tased Kohorst in "barb" mode and twice more instructed him to place his hands behind his back. Finally, Kohorst complied and was handcuffed. Shortly thereafter when Sergeant Stoler and additional back-up arrived at the scene, Officer Smith stated, "There's one more somewhere around here."

The officers successfully placed Kohorst in the back of a squad car. While they waited for paramedics to arrive, Kohorst began kicking the interior of the squad car door and slammed his head into the plexiglass partition somehow managing to slip one leg over his handcuffs so that his wrists were cuffed between his legs in an awkward position. Sergeant Stoler attempted to fix Kohorst's handcuffs. He told Kohorst, "Now listen . . . listen to me. You are going to come out here, lay down and we are going to handcuff you and you're not going to give us any problems, are you clear? If you give us problems, you will be tased again." With Kohorst still in the vehicle, Sergeant Stoler began to undo Kohorst's cuffs and said, "If you do anything with this hand . . .." Before Sergeant Stoler could finish his sentence Kohorst began

to visibly resist, leading Sergeant Stoler to command, "Don't, don't twist your hand." Another officer suggested pulling Kohorst from the vehicle in order to reapply the handcuffs. Sergeant Stoler then lifted Kohorst out of the squad car with two hands and dropped him to the ground. Kohorst believes his head struck the ground, although he concedes he has no memory of any of the relevant events of November 19, 2015. In the absence of Kohorst's ability to testify, the court is left with the recordings and the officers' testimony. Sergeant Stoler testified at his deposition that he placed Kohorst on Kohorst's side and shoulder to reduce the risk of head injury. After Kohorst's handcuffs were fixed, the officers asked him, "Your buddy live around here?" An officer inquired if Kohorst and his friend were the individuals from the movie theater fight. Officer Smith replied, "I bet you they were."

Kohorst sued both Officers Smith and Stoler under 42 U.S.C. § 1983 alleging excessive force in violation of the Fourth Amendment. Kohorst alleges he suffered a concussion and facial lacerations. As previously noted, Kohorst testified that he has no memory of any of the relevant events that occurred on November 19, 2015. The district court granted summary judgment to both officers based on qualified immunity. Kohorst appeals the grant of summary judgment.

## II. Discussion

We review a district court's grant of summary judgment based on a finding of qualified immunity *de novo*, viewing the record in the light most favorable to the plaintiff and making all reasonable inferences in his favor. Ehlers v. City of Rapid City, 846 F.3d 1002, 1008 (8th Cir. 2017). We resolve all genuine issues of material fact in the non-moving party's favor. Scott v. Harris, 550 U.S. 372, 380 (2007). However, we will not adopt a version of the facts when it is blatantly contradicted by the record such that no reasonable jury could believe it. Id.

Qualified immunity shields government actors from legal liability unless the actor's conduct violated "clearly established statutory or constitutional rights of which a reasonable person would have known." McGuire v. Cooper, 952 F.3d 918, 922 (8th Cir. 2020) (internal quotation marks omitted). To be clearly established, the contours of the right must be clear enough that a reasonable officer would understand that the act in question violates the right. Ehlers, 846 F.3d at 1008. Existing law need not be directly on point to clearly establish a right, but it must put the question beyond debate. Jackson v. Stair, 944 F.3d 704, 711 (8th Cir. 2019).

When evaluating a Fourth Amendment excessive force claim under § 1983, we consider "whether the amount of force used was objectively reasonable under the particular circumstances." Michael v. Trevena, 899 F.3d 528, 532 (8th Cir. 2018). We evaluate the reasonableness of the force used from the perspective of a reasonable officer on the scene, not with the benefit of hindsight. Id. This evaluation entails careful consideration of the case's particular facts and circumstances, including: (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight." Id. (citing Graham v. Connor, 490 U.S. 386, 396 (1989)). We may also consider the result of the use of force. Crumley v. City of St. Paul, 324 F.3d 1003, 1007 (8th Cir. 2003).

The use of force is least justified against a nonviolent misdemeanant who does not flee or actively resist arrest and poses little threat to officers or the public. Jackson, 944 F.3d at 711. "When a suspect is passively resistant, somewhat more force may reasonably be required." Wertish v. Krueger, 433 F.3d 1062, 1066–67 (8th Cir. 2006). The failure to follow police instruction may constitute passive resistance. See Ehlers, 846 F.3d at 1011; see also Jackson, 944 F.3d at 711. Whether a suspect's resistance is intentional does not impact how a reasonable officer would interpret the suspect's behavior. Ehlers, 846 F.3d at 1011. An officer is entitled to use the force necessary to effect an arrest where a suspect "at least appears to be resisting." Id. We

have upheld the use of force where a suspect is non-compliant and resists arrest or ignores commands from law enforcement.  See Jackson, 944 F.3d at 711.

## A.  Officer Smith

Kohorst alleges Officer Smith did not see the CAD report on the theater disturbance and as a result he should have been treated as a non-violent misdemeanant.  However, Kohorst's allegation does not raise a genuine issue of material fact as to whether Officer Smith viewed the CAD report because he asserts only a single non-conjectural assertion: that another officer stated that some officers keep their CAD laptops closed.  This assertion is, however, directly refuted by body-cam video that plainly shows Smith's laptop open as he arrives at the scene.

In addition, Officer Smith's unrefuted deposition testimony demonstrates that he suspected Kohorst of being involved in the theater fight, but did not mention it during his encounter with Kohorst due to safety concerns and lack of information. While Officer Smith's initial incident report did not mention the movie theater fight, he supplemented his report to include his suspicions that Kohorst was involved in the fight.  While on scene and after handcuffing Kohorst, Officer Smith told Sergeant Stoler that "[t]here's one more somewhere around here," evidencing Officer Smith's belief that his encounter with Kohorst occurred with another suspect nearby.  Officer Smith can also be heard on the body-cam video stating he believed Kohorst was involved in the movie theater fight when asked by his colleagues.  The undisputed evidence in the record establishes it was reasonable for Officer Smith to approach Kohorst as a potential suspect in an assault investigation who posed a threat to officer safety.

## I. Takedowns

Kohorst first claims that Officer Smith's arm-bar takedown and later push into the ground constitute unreasonable uses of force. In <u>Ehlers</u>, we upheld the finding of qualified immunity when an officer executed a takedown after Ehlers twice ignored orders to put his hands behind his back. 846 F.3d at 1007. Once Ehlers was on the ground, the officer pushed Ehlers' head down before ordering him to put his hands behind his back. <u>Id.</u> We determined that the takedown did not violate a constitutional right because Ehlers "at least appeared to be resisting" so the officer was entitled to use necessary force to restrain him. <u>Id.</u> at 1011.

Based on the circumstances confronting Officer Smith when he arrived on the scene, the arm-bar takedown and the pushing down of Kohorst, who at minimum appeared to be resisting and was not complying with commands, do not rise to the level of force required to constitute a constitutional violation. <u>See</u> <u>Vester v. Hallock</u>, 864 F.3d 884, 887 (8th Cir. 2017) (finding an arm-bar takedown not a constitutional violation based on subject's alleged criminal conduct, refusal to comply with repeated commands, potential threat to officer's safety, and fact that officer was making arrest alone). While Kohorst's extreme intoxication might make him appear harmless in retrospect, the facts that confronted Officer Smith were anything but harmless. An officer could reasonably and objectively believe that Kohorst was not alone, that Kohorst had previously been involved in an altercation, that Kohorst was noncompliant, and that as the only law enforcement officer on the scene Officer Smith needed to be wary of Kohorst because he could be aided at any time by the second suspect. Thus, Officer Smith had a reasonably objective belief that takedown force was appropriate. <u>See</u> <u>Karels v. Storz</u>, 906 F.3d 740, 745 (8th Cir. 2018) (describing takedowns as appropriate when officers face noncompliant arrestees and circumstances fraught with danger and unpredictability); <u>see also</u> <u>Murphy v. Engelhart</u>, 933 F.3d 1027, 1029–30 (8th Cir. 2019) (finding it not clearly established

that an officer could not throw or shove an uncooperative, noncompliant, intoxicated individual to the ground on the shoulder of a dark highway).

### ii. Tasings

Kohorst next alleges that Officer Smith's use of the taser constituted excessive force in violation of the Fourth Amendment. We have previously determined that an officer may interpret a suspect laying on his stomach with his hands underneath him and refusing to give his hands to officers as resistance. See Carpenter v. Gage, 686 F.3d 644, 649–50 (8th Cir. 2012); see also Ehlers, 846 F.3d at 1011. "Unarmed, passively resisting subjects can pose a threat necessitating the use of taser force." Cravener v. Shuster, 885 F.3d 1135, 1140 (8th Cir. 2018).

In Jackson, we examined the reasonableness of an officer tasing a noncompliant, aggressive suspect three times. 944 F.3d at 711–13. We determined that the officer had used excessive force in tasing Jackson a second time, almost immediately after the first while Jackson was not given an opportunity to comply with the order and was unable to resist or flee. Id. at 712–13. Even so, we upheld the first and third tasings because they occurred while Jackson was resisting and non-compliant. Id. at 711–13. Similarly, we found no excessive force when a deputy tased an unarmed, passively resisting subject five times. See Cravener, 885 F.3d at 1139–40.

Here, Officer Smith's use of the taser resembles the first and third tasings from Jackson. "Officer [Smith] gave several clear orders for [Kohorst] to stop moving and lay down on his stomach, or he would be tased." See Jackson, 944 F.3d at 713. Because Kohorst's arms were at times underneath him or at his sides after the tasings and orders, a reasonable officer in Smith's position could have perceived Kohorst to be resisting arrest and could have feared for his safety. Id.

While Officer Smith's takedowns and repeated tasings of Kohorst "likely reside[] on the hazy border between excessive and acceptable force, we cannot conclude that only a plainly incompetent officer would have believed the force used . . .was constitutionally reasonable." Blazek v. City of Iowa City, 761 F.3d 920, 924 (8th Cir. 2014) (internal quotation marks omitted). Officer Smith's actions, while a close call, did not violate a clearly established right and the district court did not err in granting qualified immunity.

**B. Sergeant Stoler**

Kohorst alleges that Sergeant Stoler used excessive force in removing him from the back of the squad car. An arresting officer need not avoid risk of harm or even take the most prudent course of action when transporting an arrestee. Kasiah v. Crowd Sys., Inc., 915 F.3d 1179, 1184 (8th Cir. 2019). Nor are officers required to treat detainees as gently as possible. Blazek, 761 F.3d at 926. However, "when a person is subdued and restrained with handcuffs, a 'gratuitous and completely unnecessary act of violence' is unreasonable and violates the Fourth Amendment." Id. at 925 (quoting Henderson v. Munn, 439 F.3d 497, 503 (8th Cir. 2006)).

In Blazek, we denied qualified immunity when officers jerked a handcuffed and under control subject from the floor to his bed with enough force to tear his rotator cuff. 761 F.3d at 925. While Blazek was also intoxicated, he was not suspected of any crime and at the time of the officers' use of force "was not resisting and posed no threat to the officers." Id. In contrast, Kohorst was suspected of being involved in a fight earlier in the night and had been acting violently in the back of the squad car: hitting his head against the plexiglass, kicking his legs, and contorting his body enough to at least partially escape his handcuffs. Given the physical situation Kohorst had worked himself into, it was entirely possible that Kohorst could work his way to having his handcuffs in front of him, a dangerous and potentially lethal situation for the officers.

-10-

When Sergeant Stoler informed Kohorst that he needed to fix Kohorst's handcuffs, he warned Kohorst not to "give us any problems." As Sergeant Stoler attempted to remove the handcuffs so Kohorst could exit the vehicle he instructed Kohorst not to do anything with his hands. Kohorst, however, began twisting his hands and ignored Sergeant Stoler's instructions not to do so. Such actions could lead to an objectively reasonable belief that Kohorst would resist or fight back. See Saucier v. Katz, 533 U.S. 194, 205 (2001) ("If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed.").

Kohorst attempts to compare Sergeant Stoler's actions to the yank in Blazek, but video of the encounter establishes that Sergeant Stoler's removal of Kohorst from the back of the vehicle was not a "gratuitous and completely unnecessary act of violence." Unlike Blazek, Kohorst was uncooperative, arguably resisting, and posed a potential threat as he had already attempted to escape his handcuffs. While we view the evidence in the light most favorable to Kohorst, no reasonable jury could review the video and conclude that Sergeant Stoler's action was gratuitous or unnecessarily violent–especially where Kohorst has no recollection of the event to testify to. Kohorst has also offered no evidence to refute Sergeant Stoler's explanation that he intended to place Kohorst in a way that reduced injury risk. Cf. Burnikel v. Fong, 886 F.3d 706, 712 (8th Cir. 2018) ("Accordingly, a reasonable officer would have understood that purposefully dropping [a subject] face-first onto the concrete after he had been subdued and handcuffed would violate clearly established law.")

Sergeant Stoler's movement of Kohorst, an at least passively resisting suspect, was not gratuitous or unnecessarily violent. Even if we were to find that Sergeant Stoler's actions violated a constitutional right, it was not clearly established at the time that such force could not be used against a resisting, non-compliant suspect. The district court did not err in granting qualified immunity.

-11-

## III.  Conclusion

For the foregoing reasons, we affirm the judgment of the district court.

KELLY, Circuit Judge, concurring in part and dissenting in part.

I do not agree that Officer Smith is entitled to qualified immunity on Kohorst's excessive-force claim stemming from his initial takedown.  First, there is a genuine dispute over whether Smith knew Kohorst was a suspect in a fight when he threw Kohorst to the ground face-first.  The Burnsville Computed Aided Dispatch (CAD) system sends electronic messages to dispatched officers, which they can view on laptops in their cars.  The following entry appears on the CAD system records in this case:

> 2 INTOXICATED WMALES = ONE TALL 6FT BLONDE WHITE
> SKINNY OTHER 5FT 8IN
> SKINNY INTOXICATED AND WALKING ON FOOT TOWARDS
> BUTTERNUT LANE [REPORTING PERSON] HAD
> DROPPED THEM OFF FROM THE MOVIE THEATER = MALES
> TOLD [REPORTING PERSON] THATS WHERE THEY
> LIVE - [REPORTING PERSON] BELIEVES IT IS NOT AND
> CONCERNED FOR THEIR
> SAFETY
> THE TWO MALES ARE POSSIBLE SUSP IN PREVIOUS FIGHT AT
> THE BURNSVILLE MOVIE THEATER

Smith testified that he reviewed the contents of the CAD message before encountering Kohorst.  But Kohorst disputed this.  He offered evidence that Smith had not seen the bottom portion of the CAD message that alleges Kohorst was a possible suspect in a fight.  Kohorst's evidence showed that Burnsville police officers

-12-

often do not monitor the full CAD message as they patrol, so they can be better aware of their surroundings. He also pointed to Smith's initial incident report, where Smith made no mention of suspecting Kohorst of being involved in a fight and noted only that he was dispatched "to check [o]n two intoxicated males." Smith's use-of-force report also did not reference that Kohorst was a possible suspect. Indeed, Smith only reported Kohorst's suspect status several days later, after he learned that Kohorst had filed a complaint against him. A reasonable jury that heard this evidence could doubt the veracity of Smith's testimony about when he learned of the alleged fight.

The court concludes that Kohorst's evidence does not create a genuine dispute of material fact because the body-cam footage shows that Smith's laptop was open as he arrived on the scene. Ante at 7. But this does not establish that Smith read the entire CAD message. And because the allegation of a prior fight appeared only at the end of the CAD message, a jury could credit Kohorst's evidence and decide Smith did not know Kohorst was suspected of any crime. On summary judgment, we must view the evidence in the light most favorable to Kohorst, and it is not appropriate for this court to remove the task of assessing witness credibility from the hands of the jury. See Coker v. Ark. State Police, 734 F.3d 838, 843 (8th Cir. 2013) ("Making credibility determinations or weighing evidence in this manner is improper at the summary judgment stage."). Therefore, Kohorst must be treated as a nonviolent misdemeanant, at most, when evaluating whether Smith used excessive force. See Small v. McCrystal, 708 F.3d 997, 1005 (8th Cir. 2013) (holding that force is "least justified" against nonviolent misdemeanants).

Second, viewing the evidence in the light most favorable to Kohorst, he did not fail to comply with commands to sit on the front of the squad car and take his hands out of his pockets. When Smith first approached Kohorst, he said, "Go ahead and take a seat right there." Kohorst responded that he was looking for his friend. In a casual tone, Smith then said, "Take a seat on my car," or "Take a seat on my car, man," three times in succession over the course of five seconds. Kohorst did not sit

on the car, and the video shows Smith continuing to talk to a very intoxicated Kohorst without expressing any concern about whether Kohorst sits or remains standing. Instead, Smith continued in a conversational tone: "Do you have your ID with you? Can you get it for me?" A jury reasonably could conclude that Smith did not issue a command that Kohorst defied. See, e.g., Martin v. City of Albuquerque, 147 F. Supp. 3d 1298, 1332 (D.N.M. 2015) ("Repeatedly telling [plaintiff] to sit down is different from instructing him that failing to sit down will result in arrest. An arrest carries a penalty that could threaten an uncooperative suspect into submission.").

And while Kohorst did not remove his hands from his pockets after Smith's first request, he did after the second request. Smith even thanked Kohorst for complying. In the 15 seconds between when Smith thanked Kohorst for complying and when Smith began reaching for Kohorst's wallet, the situation was relatively calm. These were not "tense, uncertain, and rapidly-evolving" circumstances, as the court suggests. See Graham v. Connor, 490 U.S. 386, 397 (1989). Smith admitted in his initial incident report that this was simply a welfare check. The video shows Kohorst putting his arm behind his back with his wallet still in his hand, but a jury could view this motion as significantly less than a "jerk[ing]." Cf. ante at 3. Kohorst's movements were slow and he had difficulty articulating words or sentences. It was Smith's voice that quickly rose in volume and intensity when he said, "Do not fight with me." Viewing the facts in Kohorst's favor, his actions did not justify Smith's use of force.

The court relies on our decision in Ehlers v. City of Rapid City, 846 F.3d 1002 (8th Cir. 2017) to find that Smith's initial takedown did not violate a clearly established right. But that case is distinguishable. The plaintiff in Ehlers argued with police as they arrested his son, disobeyed repeated commands to step away from the squad car, and then brushed past an officer who twice ordered him to put his hands behind his back and submit to an arrest. Id. at 1007, 1011. We decided a reasonable officer would not only view the plaintiff's conduct as "noncompliant," but also that

-14-

the plaintiff "at least appeared to be resisting." Id. at 1011. We therefore found no constitutional violation when the officer "executed a spin takedown" to effect the arrest. Id. at 1007. Here, by contrast, Kohorst did not flout repeated commands to submit to an arrest or continuously interfere with sensitive police activity.

In my view, our earlier decision in Rohrbough v. Hall, 586 F.3d 582 (8th Cir. 2009) is far more apposite. There, we decided that police conduct similar to Smith's initial takedown violated the plaintiff's clearly established right to be free from excessive force. The police suspected Rohrbough of having just created a disturbance in a store. Id. at 585. Officer Hall confronted Rohrbough on the street and ordered him to stop. Id. Rohrbough turned towards the officer, who then pushed Rohrbough. Id. Rohrbough "returned the push," and Hall punched Rohrbough in the face before forcing him to the ground. Id.

We held that Hall was not entitled to qualified immunity because he "initiated the physical confrontation by pushing Mr. Rohrbough; when Mr. Rohrbough pushed back, Officer Hall punched him in the face and wrestled him to the ground." Id. Viewing the evidence in the light most favorable to Rohrbough, we decided that "a jury could conclude . . . that the force was excessive, even given the fact that Mr. Rohrbough pushed Officer Hall—a push that may have been *de minimis* or inconsequential." Id. at 586. A reasonable officer would have known Rohrbough's "actions did not pose an immediate threat to the safety of Officer Hall" and thus would have understood that forcing Rohrbough to the ground was illegal. Id. at 586–87.

Here, as in Rohrbough, the police officer initiated the physical confrontation. While Kohorst held his wallet behind his back, Smith forcefully grabbed Kohorst's right arm. Smith yelled "Don't fight with me," as he pushed Kohorst against the squad car and then used an arm-bar maneuver to force Kohorst face-first to the ground. All of this happened within a span of 17 seconds.

-15-

A reasonable jury could conclude that Kohorst's putting his arm behind his back was no more than "*de minimis* or inconsequential" resistance. See id. at 586. Indeed, if Rohrbough's pushing an officer did not justify Officer Hall's use of force, then Kohorst's moving his arm away did not justify Smith's taking Kohorst to the ground. Because a jury could reasonably conclude that Smith violated Kohorst's clearly established right to be free from excessive force during the initial takedown, Smith is not entitled to qualified immunity on this claim. See id.; see also Copeland v. Locke, 613 F.3d 875, 878, 882 (8th Cir. 2010) (holding that an officer used excessive force by forcing plaintiff to the ground after plaintiff yelled, "move the f***ing car," while the officer was engaged in a traffic stop and blocking plaintiff's driveway; just before the takedown, plaintiff "backed up and pulled his hands away" as the officer attempted to arrest him).

I also do not agree that Sergeant Stoler is entitled to qualified immunity on Kohorst's separate excessive-force claim against him. Kohorst alleges that Stoler used excessive force while removing him from the squad car. When Stoler approached Kohorst seated in the back of the squad car, he saw that Kohorst had maneuvered one leg between his handcuffed arms. At that point, Kohorst was in a contorted position and did not get out of the car as requested. As Stoler reached inside the squad car, Kohorst twisted his hands, which prevented Stoler from unfastening the cuffs. Stoler told Kohorst to stop twisting his hands, but gave no warning that he would otherwise pull Kohorst out of the car and to the ground. Stoler then grabbed Kohorst's body and forcefully yanked him from a seated position in the car and put him flat on the pavement.

The body-cam footage does not show whether Kohorst's head struck the pavement, but it does show that Kohorst landed with a loud thud. Kohorst had been speaking in a calm voice with the officers when he was seated in the car. After Stoler threw him to the ground, however, Kohorst was completely silent and had a blank look in his eyes for more than two minutes. Doctors subsequently diagnosed Kohorst

with multiple impairments, including a concussion, retrograde amnesia, acute stress reaction, major depressive disorder, anticipatory anxiety, as well as multiple bruises, sprains, and strains. The officers' own medical expert opined that Kohorst could have sustained his traumatic brain injuries from Stoler's use of force. See Rohrbough, 586 F.3d at 586 (explaining that the extent of the plaintiff's injuries is relevant to determining whether police used excessive force).

Viewing the facts in the light most favorable to Kohorst, Stoler's use of force was gratuitous and excessive under the circumstances. It is clearly established "that when a person is subdued and restrained with handcuffs, a 'gratuitous and completely unnecessary act of violence' is unreasonable and violates the Fourth Amendment." Blazek v. City of Iowa City, 761 F.3d 920, 925 (8th Cir. 2014) (quoting Henderson v. Munn, 439 F.3d 497, 503 (8th Cir. 2006)). A reasonable jury could conclude that Stoler violated this clearly established right. Before Stoler pulled Kohorst out of the car and threw him onto the hard pavement, Kohorst was subdued, handcuffed, and seated. He was talking somewhat incoherently but calmly to the multiple officers who surrounded him. No reasonable officer would perceive Kohorst as a threat to officer safety. Indeed, one officer can be heard chuckling at Kohorst's awkward position. And although Kohorst twisted his hands while Stoler attempted to remove the handcuffs, this resistance was "*de minimis* or inconsequential." See Rohrbough, 586 F.3d at 586 (pushing an officer was *de minimis* resistance).

The officers reasonably may have used *some* degree of force to reapply Kohorst's handcuffs, and we have said that "officers are not required to treat detainees as gently as possible." See Blazek, 761 F.3d at 926. But Kohorst has offered evidence to show that Stoler's actions were "gratuitous and completely unnecessary" under the circumstances. See Retz v. Seaton, 741 F.3d 913, 918 (8th Cir. 2014) (holding that reasonableness depends on whether there were "alternative courses of action available at the time force was used"). With multiple officers surrounding a subdued Kohorst, "[t]here were other means, short of the force

-17-

employed," to reapply Kohorst's handcuffs.  See .Shelton v. Stevens, 964 F.3d 747, 753 (8th Cir. 2020) (citing Retz, 741 F.3d at 918).  As a result, Stoler is not entitled to qualified immunity on this claim.  See Blazek, 761 F.3d at 926.

I respectfully dissent as to these two claims.  I otherwise concur.
_____